USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED 4/27/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
STEVEN SANTOS,

                    Petitioner,

       -against-

DAVID ROCK, Superintendent, Great
Meadow Correctional Facility, and
ANDREW CUOMO, Attorney General,
New York State,

               Respondents.
------------------------------------X

08 Civ. 10997 (BSJ)(THK)

**REPORT AND RECOMMENDATION**

TO: HON. BARBARA S. JONES, United States District Judge.
FROM: THEODORE H. KATZ, United States Magistrate Judge.

Petitioner Steven Santos ("Petitioner") brings this action for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his November 19, 2003 conviction in New York State Supreme Court, New York County, after a jury trial, of six counts of Murder in the First Degree (N.Y. Penal Law §§ 125.27(1)(a)(vii) and 125.27(1)(a)(viii)), two counts of Burglary in the First Degree (N.Y. Penal Law § 140.30(1)(a)), one count of Criminal Use of a Firearm in the First Degree (N.Y. Penal Law § 265.09(1)(a)), and one count of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03(2)). Petitioner was sentenced to six terms of life imprisonment without parole, three terms of twenty-five years in prison, and one term of five to fifteen years in prison, respectively, for those crimes.[1]  On June 26, 2007, the

---

[1] At Petitioner's sentencing, the trial judge specified that "[t]he sentences that under the law are permissible to be consecutive are, and those which are impermissible are not," but

Appellate Division, First Department, unanimously affirmed Petitioner's conviction, see People v. Santos, 41 A.D.3d 324, 838 N.Y.S.2d 74 (1st Dep't 2007), and on September 26, 2007, the New York Court of Appeals denied Petitioner leave to appeal. See People v. Santos, 9 N.Y.3d 926, 844 N.Y.S.2d 181 (2007). Petitioner is currently incarcerated.

In this proceeding, Petitioner seeks habeas relief on the grounds that he was denied effective assistance of trial counsel, due to trial counsel's failure (1) to object to the wording of the verdict sheet, which Petitioner contends misled the jury into believing that his Extreme Emotional Disturbance (EED) defense did not apply to the charges of Murder in the First Degree, (2) to object to the trial judge's oral charge to the jury, which Petitioner alleges compounded the confusion caused by the verdict sheet, and (3) to object to the prosecution's reference, during closing argument, to Petitioner's sexual assault of one of the victims, which Petitioner alleges was "inflammatory." (See Petition for Writ of Habeas Corpus, dated Dec. 18, 2008 ("Pet."), at 6; Petitioner's Memorandum of Law, dated Mar. 5, 2009 ("Pet. Mem."), at 35-50.) On appeal, the Appellate Division rejected those arguments on the merits, finding that Petitioner was not prejudiced by the alleged errors. This Court agrees and recommends that the

_____

did not specify on the record which were to be served consecutively.  (See Sentencing Transcript at 29.)

Petition be dismissed with prejudice.

**BACKGROUND**

## I. The Crime

On June 12, 2002, police responded to reports that a man had been seen breaking into apartment G23 of the Amalgamated Dwellings apartment complex on Manhattan's Lower East Side. (See Trial Transcript ("Tr.") at 423.)  When they arrived, they discovered the body of the apartment's tenant, Ray D'Amelio, (see id. at 428-29), who had been shot in the head as he lay in bed. (See id. at 431.) When the residents of G13, the apartment immediately below D'Amelio's, failed to respond to police knocks at the door, officers broke down their door.  Inside, they discovered the bodies of the apartment's elderly tenants, Sara and Lawrence Sprung, a married couple in their eighties.  (See id. at 621-22.) Sara Sprung had been struck in the face and head with a blunt object, and sexually assaulted by having candles forced into her vagina and rectum, before being shot behind her right ear. (See id. at 621.) Lawrence Sprung had been shot in the face as he lay in bed.  A fanned-out wad of personal checks had been stuffed into his mouth. (See id. at 621-22.)  Both apartments had been ransacked and robbed.

The police caught Petitioner as he attempted to flee the scene on foot.  (See id. at 440-45.)  A search of his person revealed a .380 caliber semi-automatic pistol, later revealed to be the murder

weapon, as well as credit cards and valuables belonging to the victims (see id. at 556-66).

Petitioner was arrested and taken to the 7th Precinct.  There, he waived his Miranda rights, and responded to police questioning. Initially, he claimed that he had robbed the apartments with a friend named "Mike Davis," and that "Mike" had committed the murders.  (See id. at 647-49.)  After several hours of questioning, however, Petitioner revealed that there was no "Mike," and admitted that he had committed the crimes, including the murders, alone. (See id. at 656-57.)  He signed a written statement admitting responsibility, (see id. at 666-68), and also gave a videotaped statement later that day to an assistant district attorney. (See id. at 670.)

## II. The Trial

Petitioner was charged with six counts of Murder in the First Degree, nine counts of Murder in the Second Degree, three counts of Manslaughter in the First Degree,[2] and one count each of Burglary

---

[2] The murder charges were organized around two separate theories of guilt: (1) that Petitioner committed the killings during a home burglary; and (2) that he committed the killings as part of a broader criminal transaction during which at least one other person was killed.  Each theory was charged as first-degree murder for each victim, along with lesser included offenses of second-degree murder and first-degree manslaughter.  Thus, for instance, for the killing of Ray D'Amelio, the jurors had the option of convicting Petitioner of Murder in the First Degree if they found that he had intentionally killed D'Amelio during a home burglary; or of Murder in the Second Degree if they found that he had intentionally participated in the burglary, but had not intentionally killed D'Amelio; or of Manslaughter in the

4

in the First Degree, Criminal Use of a Firearm in the First Degree, and Criminal Possession of a Weapon in the Second Degree. (See Verdict Sheet, Respondent's Appendix ("Resp't App'x") at 1-3.)

At trial, the prosecution presented overwhelming evidence that Petitioner was responsible for the killings and burglaries. Petitioner's own confessions were admitted as evidence, and witnesses testified that Petitioner's fingerprints and DNA had been found on objects in both apartments, (see Tr. at 954-56, 962-63, 993-94), that his semen was found inside Sara Sprung's anus and on the candles inserted into her body, (see id. at 983, 989), and that Lawrence Sprung's DNA had been found on Petitioner's clothing (see id. at 999).

Petitioner's chief defense was that he had been under the influence of an "extreme emotional disturbance" ("EED") when he

---

First Degree if they found that he had intentionally committed both crimes but was entitled to mitigation because of the affirmative defense of Extreme Emotional Disturbance. (See Verdict Sheet, at 1.) The jurors were also able to convict on the same-criminal-transaction theory, with the option of finding Petitioner guilty of Murder in the First Degree if they found that he intentionally killed D'Amelio and intentionally killed another person during the same criminal transaction; or Murder in the Second Degree if he intentionally killed D'Amelio but did not intentionally kill another person or did not do so as part of the same transaction; or Murder in the Second Degree if he recklessly caused the death of Ray D'Amelio; or Manslaughter in the First Degree if he intentionally killed Ray D'Amelio and intentionally killed another person during the same transaction, but was entitled to mitigation under the EED defense. (See id.)

committed the crimes.[3]   (See id. at 1052-82.)   Petitioner's EED defense was an unusual one.  He did not claim to have been exposed to an emotionally upsetting or provoking event immediately before he committed the crimes. Nor did he claim that his emotional disturbance was in any way related to his victims, or the specific circumstances of the crimes.  Rather, he claimed to have been left emotionally unstable by years of sexual abuse that he experienced as a child and teenager, and to have been sent into a further downward spiral by his breakup with a girlfriend several weeks before the murders.  (See id. at 1078-82, 1309-11.)  At trial, the defense argued that Petitioner's emotional distress after the breakup caused him to abuse drugs and alcohol, which in turn made him more and more disturbed, until eventually he snapped and committed the brutal murders.  (See id. at 1083.)

---

[3] The affirmative defense of EED has two components: "an objective element requiring sufficient proof that there was a reasonable explanation or excuse for the emotional disturbance, and a subjective element, requiring sufficient proof that the conduct was influenced by an extreme emotional disturbance at the time the alleged crime was committed." People v. White, 79 N.Y.2d 900, 903, 581 N.Y.S.2d 651, 652 (1992); see also N.Y. Penal Law §§ 125.25(1)(a), 125.27(2)(a).  To satisfy the objective element, the defendant must show that, "from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be," the emotional disturbance was reasonable.  See N.Y. Penal Law §§ 125.25(1)(a), 125.27(2)(a).  To satisfy the subjective element, a defendant need not show that the provoking event happened immediately before the crime, but he must show that "a temporally remote provocative act affected [him] at the time of the homicide to such a degree that a jury could reasonably conclude that he acted under the influence of an extreme emotional disturbance." White, 79 N.Y.2d at 903, 581 N.Y.S.2d at 652.

Petitioner also raised an intoxication defense, arguing that he had been too drunk to form the intent to commit the crimes. (See id. at 1310-11.)  In New York, "intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged."  N.Y. Penal Law § 15.25.  Had the jury accepted this defense, it would have reduced his responsibility to reckless homicide, a second-degree murder offense.

A. The Defense Expert

In support of his EED defense, Petitioner called Dr. Eric Goldsmith, a board-certified forensic psychiatrist and expert on childhood sexual abuse. (See id. at 1054-55.)  Goldsmith testified that Petitioner had experienced a damaging and traumatic childhood. Petitioner's mother was a prostitute and drug abuser, so he was primarily raised by his maternal grandmother. (See id. at 1063.) She eventually took in Petitioner's three siblings, and also cared for her own step-daughter, who was close to Petitioner's age. (See id. at 1063, 1065.)  According to Dr. Goldsmith, this left Petitioner vulnerable to the predations of Fred Massey, a friend of the family who took on an "almost fatherly role" in Petitioner's life, (see id. at 1067), but was also a pedophile who sexually abused Petitioner for years, beginning when he was seven or eight years old. (See id. at 1067-68.)

7

Petitioner never revealed the abuse to anyone, until he was interviewed by Dr. David Lisak, a psychiatrist retained by Petitioner's first defense counsel.  Dr. Lisak met with Petitioner several times, and Petitioner revealed this history of abuse to him on the third visit. (See Report on Steven Santos of Dr. David Lisak, App'x to Pet. Mem. at 73.)  Dr. Goldsmith had difficulty getting Petitioner to open up about the abuse, and so relied heavily on Lisak's report in reaching his conclusions. (See Tr. at 1081, 1135-36.)

Dr. Goldsmith believed that the sexual abuse left Petitioner in a "traumatized state," with a "fragile self-image," despite his "tough, rough exterior" and "macho" manner.  (See id. at 1079.) That caused Petitioner to develop behavioral and emotional problems by the time he was in high school, and led him to use alcohol and drugs heavily as a way of self-medicating.  (See id. at 1070-71.)

Dr. Goldsmith testified that, several months before the crime, Petitioner moved to Maryland and tried to change his life.  (See id. at 1074.)  Petitioner got a job, and began dating a young woman named Stephanie Rill. He and Stephanie moved in together, and she became a "very significant" relationship in his life.  (See id.) Several months later, however, their relationship fell apart, causing Petitioner to go into an "emotional rage." (See id. at 1077-78.)  He hurriedly left Maryland, and returned to New York, where he began "heavily abusing alcohol and drugs on an ongoing

8

basis" for several weeks, until the time of the robbery and murder of Ray D'Amelio and the Sprungs.  (<u>See</u> <u>id.</u> at 1078-79.)

In Dr. Goldsmith's opinion, "[Petitioner's] emotional condition was escalating in a negative way in the days leading up to the crime" (<u>see</u> <u>id.</u> at 1083), and at the time of the crime, "[Petitioner] was in an emotionally disturbed state due to his experience of humiliation, leading to the binge of the drugs and the alcohol." (<u>See</u> <u>id.</u> at 1083, 1140-41.)

B. <u>The Prosecution's Rebuttal Expert</u>

The prosecution presented rebuttal testimony from its own expert, forensic psychologist Dr. Stuart Kirschner.  Dr. Kirschner reviewed Dr. Goldsmith's report and other evidence from the case, and also conducted his own interviews with Petitioner, (<u>see</u> <u>id.</u> at 1174, 1176-79), from which he concluded that there was no evidence Petitioner was under the influence of any particular emotion at the time of the crime.  (<u>See</u> <u>id.</u> at 1219.)

Dr. Kirschner testified that he believed Petitioner should be considered a "psychopath," and that his crimes were the culmination of a lifetime of psychopathic behavior. (<u>See</u> <u>id.</u> at 1195.) He noted that Petitioner had described torturing animals from a very young age, including setting his aunt's cat on fire, attempting to throw a cat off of a balcony, and using cats for target practice.  (<u>See</u> <u>id.</u> at 1186-87.)   He found it particularly significant that Petitioner had displayed "absolutely no emotion" when he described

9

torturing the cats (see id. at 1187), demonstrating "callousness" and "lack of empathy." (See id. at 1191) Kirschner explained that "psychopaths engage in a wide array of criminal behavior, anything from sale of substances to robberies, burglaries, various types of crimes," and noted that Petitioner had also demonstrated this "criminal versatility" from a young age. (See id. at 1199.) From this, along with Petitioner's "grandiose" manner, his tendency to become bored easily, his descriptions of sexual promiscuity, and other past behavior such as setting his grandmother's apartment on fire, Kirschner concluded Petitioner could be considered a psychopath. (See id. at 1191-98.) Dr. Kirschner believed that Petitioner had continued to exhibit psychopathic behavior while in Maryland.[4]

Dr. Kirschner found no evidence that Petitioner's behavior during the weeks between when he left Maryland and when he committed the crime was discernibly different from his behavior at any previous time in his life, or that Petitioner was experiencing any emotion at the time of the crime, with the possible exception of temporary fear when one of his male victims awoke unexpectedly. (See id. at 1219-20.)

---

[4] Kirschner noted that Petitioner had apparently committed a number of other crimes in Maryland, including repeatedly sexually assaulting Stephanie Rill while she slept (see id. at 1212), sexually assaulting a female friend of Rill's (see id. at 1212-13), and committing two attempted burglaries and one burglary in late May, shortly before he returned to New York (see id. at 1207).

C. <u>Summation</u>

In his summation, Petitioner's counsel focused on the EED defense.   He compared Petitioner to a "tornado," arguing that Petitioner's behavior on the day of the crime was the result of a succession of events and emotional traumas that eventually precipitated an extreme emotional disturbance, and caused him to become violent.   (<u>See</u> <u>id.</u> at 1301.)   Defense counsel also reminded the jury that Petitioner was intoxicated at the time of the crime. (<u>See</u> <u>id.</u> at 1310.)   He concluded by comparing Petitioner to a child from a "Third World country," who was born into a situation of extreme hardship, with no ability to control his own life or protect himself from harm, and who therefore deserved the jury's pity.   (<u>See</u> <u>id.</u> at 1312-13.)

The prosecutor focused her summation on the victims of the crimes, and the overwhelming evidence against Petitioner. She noted that Petitioner had been caught "red-handed," fleeing the scene of the crimes, and was found with the murder weapon and stolen property from the victims' apartments on his person.   (<u>See</u> <u>id.</u> at 1313-14.)   She reminded the jury that forensic examiners had discovered Petitioner's DNA and fingerprints at the crime scene, and the victims' blood staining Petitioner's clothing.   (<u>See</u> <u>id.</u> at 1313-14, 1324.)   She also argued that Petitioner's behavior on the day of the crime, such as making up an extensive story about the imaginary "Mike Davis," was inconsistent with the claim that he had

been in the grip of such extreme emotional disturbance, or so intoxicated, that he was not fully in control of his actions. (See id. at 1336.)

The prosecutor also discussed the evidence of Petitioner's intent toward each of the victims. She noted that Ray D'Amelio had been shot at close range, and contended that this contradicted Petitioner's statement that the gun had accidentally "gone off" because he was "startled." (See id. at 1327.) She argued that even Petitioner had admitted that Lawrence Sprung's killing was intentional, when he said that he had killed Lawrence Sprung because he was "afraid he would see I just killed his wife." (See id. at 1332.) She also reminded the jury that Sara Sprung had been sexually assaulted with candles while still alive, but that they were not required to decide Petitioner's intent with regard to the sexual assault. (See id. at 1320.)

## III. The Verdict Sheet

Before the summations, the trial judge, New York State Supreme Court Justice Edward McLaughlin, discussed the verdict sheet and jury instructions with both attorneys. (See id. at 1038-51.) Defense counsel was actively involved in the discussion throughout, asking questions and responding to queries from the trial judge as well as the prosecution. (See id. at 1038-51.)

The judge explained that he intended to organize the verdict sheet into two sections, one for each apartment, and then to list

the charges in order so that each count of first-degree murder was followed by its lesser included offenses.  (See id. at 1048-50.) The final version of the verdict sheet followed that format.  With the exception of the first-degree murder charges, each of the homicide charges indicated either that the EED defense did not apply or that the jury found that Petitioner was under EED.  For example, the verdict sheet for the charges relating to Ray D'Amelio's murder read as follows:

| Count Number | Crime | Guilty | Not Guilty |
|---|---|---|---|
| 1 | MURDER IN THE FIRST DEGREE Intentionally Killed Ray D'Amelio during a home Burglary | | |
| | OR | | |
| 1-A | MURDER IN THE SECOND DEGREE Intentionally participated in home Burglary, and a participant in the Burglary caused death of Ray D'Amelio; EED does not apply | | |
| | OR | | |
| 1-B | MANSLAUGHTER IN THE FIRST DEGREE Intentionally killed Ray D'Amelio during a home Burglary but defendant was under EED | | |
| | AND | | |
| 2 | MURDER IN THE FIRST DEGREE Intentionally Killed Ray D'Amelio and intentionally killed another person in the same Criminal transaction . | | |
| | OR | | |

13

| 2-A | MURDER IN THE SECOND DEGREE Intentionally killed Ray D'Amelio but either no intentional killing of another person or the Sprung apartment events were not part of the same criminal transaction and defendant was not under EED | | |
| | OR | | |
| 2-B | MURDER IN THE SECOND DEGREE Recklessly caused the death of Ray D'Amelio; Too intoxicated to intend death of Ray D'Amelio; EED does not apply | | |
| | OR | | |
| 2-C | MANSLAUGHTER IN THE FIRST DEGREE Intentionally killed Ray D'Amelio during a home Burglary and intentionally killed another person in the same criminal transaction but the defendant was under EED | | |

Justice McLaughlin held a brief, off-the-record discussion of the final verdict sheet with the attorneys after the summations were finished. (See id. at 1343.) Both of the attorneys approved the finalized verdict sheet. They initialed each page, and defense counsel signed it. (See Verdict Sheet, attached to Resp't. Appx. at 1.)

**IV. The Jury Charge**

Justice McLaughlin gave an extensive jury charge, with detailed instructions as to the meaning of each of the charges, the elements they were required to find, the meaning of "reasonable doubt," and the applicability of the EED and intoxication defenses. He began by explaining that the prosecution had the burden of

14

proving each of the charges beyond a reasonable doubt. (See Tr. at 1355-57.) He then gave a lengthy explanation of the requisite mental states for each of the crimes alleged, and the evidence required to prove them. (See id. at 1360-67.) During that discussion, he explained the intoxication defense: that if the defendant was too intoxicated to form the necessary mental state to commit the crime, then the jury could not convict him of that offense. (See id. at 1366-67.) Next, the judge gave an overview of the various homicide offenses, and then explained their different elements, as well as the elements of the burglary offense. (See id. at 1368-73.)

The judge discussed the EED defense extensively. (See id. at 1376-78.) He explained that EED was an affirmative defense to all charges of intentional killing, which meant that if the prosecution proved beyond a reasonable doubt that the defendant had committed an intentional killing, the defendant then had the burden of proving by a preponderance of the evidence that he was under EED at the time he committed the crimes. If the defendant met that burden, then he would be entitled to a conviction of manslaughter, rather than intentional murder in the first or second degree. (See id.)

Justice McLaughlin noted that the verdict sheet would guide the jurors in their deliberations. He suggested that they begin by considering what the defendant's mental state was with regard to

each of the killings, and then work through the charges and possible defenses for the crimes committed in each of the apartments.

## V. Verdict and Appeal

The jury deliberated for just over two and a half hours before convicting Petitioner of six counts of Murder in the First Degree, two counts of Burglary in the First Degree, one count of Criminal Use of a Firearm in the First Degree, and one count of Criminal Possession of a Weapon in the Second Degree. (See id. at 1404-09.)

During their brief deliberations, the jurors asked only one question, requesting clarification of the term "criminal transaction." (See id. at 1403-04.) They did not ask any questions about the definition of EED, or the applicability of the EED defense to the various charges.

Petitioner appealed his conviction, raising numerous claims including (1) that the verdict sheet was improperly annotated, and misled the jury as to the applicability of the EED defense, (see Brief for Defendant-Appellant to the New York Supreme Court Appellate Division, First Department, dated Sept. 2006, ("Pet. App. Br."), Resp't App'x at 148-49); (2) that the trial judge's jury charge was confusing, (see id. at 154); and (3) that his trial counsel was ineffective (see id. at 155-61). The Appellate Division found that all of Petitioner's claims about the charge and verdict sheet were waived or unpreserved, and declined to reach

16

them in the interests of justice. See Santos, 41 A.D.3d at 325, 838
N.Y.S.2d at 75. However, the court stated, were it to consider the
claims, it would find that "neither the verdict sheet nor the
isolated portion of the charge challenged on appeal created a
reasonable possibility of misleading the jury into thinking that
the defense of extreme emotional disturbance did not apply to
murder in the first degree, or that the jury had the option (as
opposed to the obligation) to consider that defense." Id. The
court noted that the trial judge had "explicitly told the jury that
this defense applied to first degree murder," and found nothing in
the charge or verdict sheet that would have contradicted that
instruction. Thus, it concluded, "[d]efendant's present objections
to the verdict sheet and charge are essentially matters of form,
not substance." Id.

The Appellate Division also rejected Petitioner's ineffective-
assistance claim, finding that "none of these alleged deficiencies
could have caused defendant any prejudice, and that none of these
issues were such that prejudice should be presumed from counsel's
failure to raise them." See id. at 75-76 (comparing Bloomer v.
United States, 162 F.3d 187, 194 (2d Cir. 1998)).

DISCUSSION

Petitioner argues that his trial counsel was ineffective for
(1) consenting to the wording of the verdict sheet, which did not
incorporate references to the EED defense into any of the first-

17

degree murder charges, (2) failing to object to the trial judge's oral charge to the jury, which Petitioner alleges was confusing, and (3) failing to object when the prosecutor discussed Sara Sprung's sexual assault during her closing arguments, which Petitioner contends was an impermissible appeal to the jurors' emotions.

Respondents argue that a "plain reading of the verdict sheet and trial court's instructions" shows that the court correctly conveyed the law regarding the EED defense (see Resp. Mem. at 39); that Petitioner cannot have suffered any prejudice because "no rational jury" could have found that his crimes were caused by EED (see id.); and that, given the "avalanche of proof" against Petitioner, the prosecutor's statements during closing arguments could not possibly have affected the verdict (see id. at 58-59).

## I. Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006); Ernst J. v. Stone, 452 F.3d 186, 193 (2d Cir. 2006).   The phrase, "clearly established Federal law," limits the law governing a habeas petitioner's claims "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006) (quoting Williams, 529 U.S. at 412, 120 S. Ct. at 1523); accord Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006).

"The 'unreasonable application' standard is independent of the 'contrary to' standard . . . [and] means more than simply an 'erroneous' or 'incorrect' application" of federal law. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (citing Williams, 529 U.S. at 410-11, 120 S. Ct. at 1522).   A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. See Williams, 529 U.S. at 413, 120 S. Ct. at 1523.   The inquiry for a

federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but, rather, whether it was "objectively unreasonable." Id. at 409-10, 120 S. Ct. at 1521-22; see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently.  The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."); Lurie v. Wittner, 228 F.3d 113, 129 (2d Cir. 2000) (same).

Moreover, under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility.").  A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

By its terms, § 2254(d) requires that the deference outlined above be given "only with respect to a state court adjudication 'on the merits,' not to a disposition 'on a procedural, or other,

20

ground.'" Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003) (citations omitted). "For the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim 'on the merits' when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001). In determining whether a state court has adjudicated a state prisoner's federal claim on the merits, its decision must be viewed liberally. See id. ("[A] federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim - even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.").

## II. Ineffective Assistance Legal Standard

For the purpose of AEDPA, ineffective assistance of counsel claims are "squarely governed by [the Supreme Court's] holding in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984)." Williams, 529 U.S. at 390, 120 S. Ct. at 1511; accord Eze v. Senkowski, 321 F.3d 110, 124 (2d Cir. 2003). A petitioner must satisfy a two-part test in order to establish that his Sixth Amendment right to effective assistance of counsel has been violated. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Henry, 409 F.3d at 62-63; Lanfranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002). He must show (1) that counsel's representation fell below an objective standard of reasonableness, under

prevailing professional norms, and (2) that the deficient performance of counsel prejudiced the defense. See Henry, 409 F.3d at 63 (citing Strickland, 466 U.S. at 687-88, 104 S. Ct. at 2064-65).

In applying the first prong of the Strickland test, determining the quality of representation, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (internal quotation marks and citations omitted). A strategic decision is a "'conscious, reasonably informed decision made by an attorney with an eye to benefitting his client.'" Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004) (quoting Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001)). A court "must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" Henry, 409 F.3d at 63 (quoting Strickland, 466 U.S. at 689, 104 S. Ct. at 2065); see Cox, 387 F.3d

22

at 198 (same); see also United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987) ("We will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed."). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003) (per curiam).

Under the prejudice prong of the Strickland test, a habeas petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

In order to satisfy the Strickland test, a petitioner must meet the standards of both components. However, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id., 466 U.S. at 697, 104 S. Ct. at 2069.

Finally, to succeed, a petitioner "must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance." Bell v. Cone, 535 U.S. 685, 698-99, 122 S. Ct. 1843, 1852 (2002). Under AEDPA, it is insufficient to "convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. . . . Rather, [a petitioner] must show that [the court] applied

23

Strickland to the facts of his case in an objectively unreasonable manner." Id. at 699, 122 S. Ct. at 1852 (citation omitted).

## III. Application

Petitioner has not shown that the state court's rejection of his ineffective assistance claim was either contrary to, or an unreasonable application of, the Strickland standard. Nor has he shown that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(2).

Because the Appellate Division focused on the prejudice prong of the Strickland standard, this Court will focus its analysis there also. See Santos, 41 A.D.3d at 325, 838 N.Y.S.2d at 75.

### A. The Jury Charge and Verdict Sheet Were Not Misleading

In order to satisfy Strickland's prejudice prong in a case where counsel's alleged inadequacy was a failure to object to an improper jury instruction, a petitioner must show that the errors in the instructions were so significant that they "prejudiced the outcome of his trial, such that our confidence in the outcome is undermined." Cox v. Donnelly, 387 F.3d 193, 199-200 (2d Cir. 2004) (finding prejudice where counsel failed to object to a defective jury charge on intent, the main issue at trial, even after the jury twice asked for clarification on that issue and was given the defective instruction twice more). The Supreme Court has long held that "a single instruction to a jury may not be judged in

24

artificial isolation, but must be viewed in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S. Ct. 396, 400 (1973). Thus, even if some part of the instructions given to the jury could be confusing or misleading when viewed in isolation, there is no error if the instructions as a whole were clear and unambiguous. See Jones v. United States, 527 U.S. 373, 391, 119 S. Ct. 2090, 2103 (1999). "[I]nstructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions." Id.; see also Estelle v. McGuire, 502 U.S. 62, 72, 112 S. Ct. 475, 482 (1991). Courts "do not review portions of the instructions in isolation, but rather consider them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." United States v. Weintraub, 273 F.3d 139, 151 (2d Cir. 2001); see also U.S. v. Shamsideen, 511 F.3d 340, 348 (2d Cir. 2008) (correct instructions, "particularly when given repeatedly, can render a charge adequate in its entirety, despite the inclusion of some objectionable language").

Petitioner argues that the verdict sheet was misleading because the omission of references to the EED defense, in relation to the first-degree murder charges, gave the jury the impression that EED did not apply to those charges. He also claims that the oral jury charge was confusing and gave the impression that consideration of the EED defense was optional, because (1) the

25

charge went on for a long time, and "jumped back and forth between
legal principles" (Pet. Mem. at 37); (2) it suggested that, if the
prosecutor proved the crimes beyond a reasonable doubt, the jury
was to end deliberations and return a guilty verdict" (see id. at
31); and (3) it contained "contradictory instructions" regarding
the applicability of the EED defense (see id. at 32). Petitioner's
arguments are without merit.

In claiming that the verdict sheet and jury charge were
confusing and misleading, Petitioner asks the Court to focus on
small pieces of each, in "artificial isolation," contrary to the
Supreme Court's approach in Cupp. See Cupp, 414 U.S. at 146-47, 94
S. Ct. at 400. When the jury instructions and verdict sheet are
examined in full, it is clear that the alleged deficiencies, if
any, were not significant, and were, in any case, cured by the
court's accurate, detailed explanation of the EED defense.

The verdict sheet was not misleading. Although it omitted an
EED annotation for the first-degree murder charges, it clearly
conveyed that, if the defendant had committed an intentional
killing but was under EED, the jury was to convict him of first-
degree manslaughter. (See Verdict Sheet, charges 1-B, 2-C, 4-B, 5-
C, 6-B, 7-C.) If the verdict sheet's omission of a reference to
EED for the first-degree murder charges raised questions in the
jurors' minds, they would have been answered by the wording
relating to the manslaughter charges, which precisely mirrored the

first-degree murder wording but for the single addition of the phrase "but defendant was under EED." (See id.) Moreover, the verdict sheet explicitly identified the counts to which EED did not apply. (See id.)   Although the verdict sheet might have been a clearer tool for the jury if the first-degree murder charges explicitly excluded an EED defense, the fact that the verdict sheet could have been improved upon is not sufficient to show that the jury was misled by the version it was provided.   The jurors themselves gave no sign of confusion. Cf. Cox, 387 F.3d at 199-200 (confusion caused by improper intent instruction was evident from jury's two requests for supplemental instructions on the intent issue during their deliberations).   Moreover, as discussed below, the court explicitly instructed the jury on the applicability of the EED defense to the first-degree murder charges.   Given the overwhelming evidence of guilt, the speculative nature of the defense psychiatrist's testimony about Petitioner's emotional state, the jury charge, and the jury's verdict, which required them to reject the EED defense, there is no reasonable probability that a different verdict sheet would have altered the outcome.

Petitioner also claims that the jury charge was too long, and therefore gave the impression that consideration of the EED defense was optional.   Given the large number of charges and legal issues

to be considered, a lengthy charge was unavoidable.[5]   Likewise,
Petitioner's objection that the judge "shifted repeatedly from the
elements of the crimes to the principles of law," (see Pet. Mem. at
31), is without merit.   Certain elements of the crimes, such as the
necessary mens rea, could not be described without reference to
principles of law. Therefore, it was reasonable for the judge to
have discussed legal principles in conjunction with his explanation
of the charges to which they applied.

The trial judge did not suggest, as Petitioner claims, that if
the prosecution proved the crimes beyond a reasonable doubt, the
jury was to end deliberations and return a guilty verdict without
considering the EED defense.   (See id.)   The statement on which
Petitioner rests this argument was part of the judge's explanation
of the prosecution's burden of proof.   He explained to the jury

---

[5] Petitioner was charged with 25 different criminal counts,
some of which were lesser included offenses.   The jurors were
required to consider at least three mental states (e.g.,
intentional killing and burglary, reckless killing, and knowing
possession of a firearm).   In some charges, the different acts
required consideration of more than one mental state.   For
instance, one of the theories of second-degree murder was that
Petitioner had intentionally participated in the home burglary,
but not committed an intentional killing.   The jurors were also
faced with one defense to the formation of mens rea
(intoxication), and one affirmative defense (EED), requiring them
to grasp not only the prosecution's burden of proof, but
Petitioner's as well.   Complicating things even further, they
were asked to consider intoxication at two stages: first, in
determining whether Petitioner had been able to form the intent
to kill, and then again, when evaluating Petitioner's EED
defense, they were required to consider whether his intoxication
might have contributed to his emotional disturbance.

that the defendant was presumed innocent, and that the burden of proving guilt beyond a reasonable doubt lay exclusively with the prosecution. The statement to which Petitioner objects is in bold:

> The burden is exclusively the People's with regard to establishing the elements of the crime. **I'll talk to you more later about the burden of proof that the defense would bear with respect to the concept of extreme emotional disturbance.** But you don't get there unless the prosecution has proven the elements of certain crimes beyond a reasonable doubt. In other words, the defendant is entitled to rest on the presumption of innocence in his favor until the presumption is so far outweighed by the evidence offered, that you are convinced of his guilt beyond a reasonable doubt.

(Tr. at 1355-56 (emphasis added).) Read in context, that statement was not a dismissal of the importance of the affirmative defense. Rather, it was a reminder that, even if the prosecution successfully met its heavy burden of proof, there would still be an affirmative defense to consider. That reminder cannot have prejudiced Petitioner.

Nor did the court give "contradictory instructions" regarding the applicability of the EED defense. Petitioner argues that, during the charge, the trial judge first told the jury that if the prosecution established that the defendant had committed an intentional killing, "*then* you have to decide" if EED applies, (see Tr. at 1379), and then a few moments later said that if the prosecution had met its burden for first- or second-degree murder "*and* you are considering the affirmative defense of EED," then the defendant would have the burden of proving it. (See id. at 1380.)

This minor shift in language does not rise to the level of a contradiction. The jurors could not reasonably have concluded that the change from "then" to "and" meant that their consideration of the EED defense had somehow suddenly become optional.

In fact, the judge repeatedly and specifically stated that EED was a defense to all of the intentional murder charges, including first-degree murder. (See, e.g., Tr. at 1376-77 ("EED applies only to an intentional killing. It applies to an intentional killing when it's intentional killing as murder in the first degree or an intentional killing as murder in the second degree."); Tr. at 1377 ("under intentional killing, whether it's first or second degree, you would have to consider [EED]"); Tr. at 1378-79 ("if you have decided that the prosecution has proven one or more of these intentional killings under any of the theories that are here, then you have to decide whether [the defense has met its burden of proving EED]").) Thus, even if other aspects of the charge or the verdict sheet had been vague or confusing, the judge's explicit instructions would have cured any such deficiency.

Because the jury charge and verdict sheet, taken as a whole, were not misleading, there is no likelihood that the outcome of the trial would have been different if Petitioner's counsel had objected to them. Therefore, it follows that Petitioner's trial counsel was not professionally unreasonable for failing to object to them. Accordingly, Petitioner cannot satisfy the Strickland

standard on this claim, and the Appellate Division's conclusion that counsel was not ineffective was a reasonable application of <u>Strickland</u>.

B. <u>The Verdict Sheet Did Not Violate New York Law</u>

Petitioner also argues that his attorney was ineffective because the verdict sheet violated New York law, and so his conviction would automatically have been reversed if his attorney had objected at trial. Although habeas relief is ordinarily unavailable for violations of state law, a defense lawyer's failure to object to a state-law error which would have led to an automatic reversal of the verdict can satisfy the second <u>Strickland</u> prong. <u>See</u> <u>Flores v. Demskie</u>, 215 F.3d 293, 305 (2d Cir. 2000) (trial counsel who waived a strong <u>Rosario</u>[6] claim without reason, despite the trial judge's warning to the prosecution that it risked an order setting aside the verdict, caused sufficient prejudice because the defendant would have been granted a new trial but for the defense attorney's waiver of the <u>Rosario</u> claim); <u>cf.</u> <u>Anderson v. Keane</u>, 283 F. Supp.2d 936, 945-46 (S.D.N.Y. 2003) (no prejudice where appellate counsel failed to raise claim that verdict sheet violated New York law, because reversal of conviction would have been a matter of discretion, not automatic). However, an

_____

[6] <u>People v. Rosario</u>, 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961) held that statements made by prosecution witnesses before trial must be turned over to defense counsel for review for cross-examination purposes.

examination of the state law in question reveals that Petitioner's argument is misguided.

Under New York law, a verdict sheet's content is limited to the charged offenses and the possible verdicts thereon, unless counsel for both parties consent to additional annotations.  See CPL §§ 310.20, 310.30; People v. Damiano, 87 N.Y.2d 477, 483, 640 N.Y.S.2d 451 (1996) ("Thus, when the court determines that listing statutory elements or terms of the crime – whether as labels or a shorthand for statutory text – on the verdict sheet will aid the jury in their deliberations, the court must permit counsel to review the annotated verdict sheet and obtain counsel's consent prior to submitting it to the jury."); People v. Sotomayer, 79 N.Y.2d 1029, 1030, 584 N.Y.S.2d 431 (1992) (submission of verdict sheet with additional annotations to jury, without consent from the parties, was reversible error); People v. Gerstner 270 A.D.2d 837, 837-38, 706 N.Y.S.2d 542 (4th Dep't 2000) (defense counsel's lack of objection to annotated verdict sheet cannot be transmuted into consent).  Therefore, although "it is per se reversible error to give a jury a verdict sheet that contains anything other than what is permitted by CPL § 310.20(2) without the consent of defense counsel," Anderson, 283 F. Supp. 2d at 943 (S.D.N.Y. 2003), there is no error if defense counsel *does* consent.  See Damiano, 87 N.Y.2d at 483.  Here, Petitioner's attorney consented to the annotated verdict sheet, as did the prosecutor.  Their consent

32

cured any violations of New York law that the annotations might otherwise have caused. Moreover, there was no error in defense counsel consenting to the annotations, because they served to guide and clarify the jury's deliberations in a manner that was at least as beneficial to Petitioner as to the prosecution.

Petitioner argues that, had his trial counsel refused to consent, the trial judge might have refused to alter the verdict sheet and submitted an annotated version to the jury over counsel's objection, rendering his conviction per se reversible. (See Pet. Mem. at 38.) That argument is wholly speculative, and there is no reasonable likelihood that the outcome Petitioner hypothesizes would have resulted. The record shows that the trial judge engaged in extensive discussions of the verdict sheet with counsel, and took their suggestions and requests into account when drafting it. (See Tr. at 1272-73 (at defense counsel's request, trial judge agreed to omit the definition and elements of EED from the verdict sheet); 1278-81 (at prosecutor's request, trial judge agreed to amend the verdict sheet to clarify that EED did not apply to the second-degree murder charges alleging that Petitioner had intentionally participated in the burglary, but not intentionally killed the victims).) The judge also gave both attorneys an opportunity to review and consent to the verdict sheet in its final form before his jury charge. (See id. at 1343.)

The annotated verdict sheet thus served Petitioner's

interests, and it would not have been professionally reasonable for defense counsel to object to the annotations. In any case, there is no reason to believe that, if Petitioner's trial counsel had refused to consent to the verdict sheet, the trial judge would have given it to the jury over his objection.   Because Petitioner has not demonstrated that it was unreasonable for defense counsel to consent to the verdict sheet, or that had he objected there is a reasonable likelihood that the trial court would commit reversible error by submitting the annotated verdict sheet to the jury, Petitioner fails to satisfy the <u>Strickland</u> standard on this claim. It follows that the Appellate Division's determination that defense counsel was not ineffective was not an unreasonable application of the <u>Strickland</u> standard.

### C. <u>Objection to The Prosecutor's Statements in Summation Would Not Have Affected the Jury's Verdict</u>

Petitioner also argues that his trial counsel was ineffective because he failed to object when the prosecutor made the following statement during her summation:

> Something that is not an element of the crime that need not be proven to you beyond a reasonable doubt, is whether Sara Sprung was alive, or dead, or unconscious when he did what he did.  Now, the medical examiner says her heart was still beating.   If her God was watching over her that day, then she was unconscious.   But it's not something they have proven.   What his intent was when he did that need not be proven.   You will need to make factual determinations about the defendant's intent at the time of the murders, at the time of the burglary, at the time of possession of the weapon.   But what he intended when he sodomized and forcibly inserted the

> candles is not an issue, an element, in any of the crimes
> that are being submitted to you.

(Tr. at 1320.)   In Petitioner's view, because he was not charged
with sexual assault, those references were an attempt to "inflame
the passions of the jury," and to "appeal to the religious
sentiments of the jury." (Pet. Mem. at 45.)   He argues that, had
his attorney objected, "the court would have been obligated to
instruct the jury to disregard them, resulting in a more unbiased
view of the evidence and petitioner's defense."   (Id. at 46.)
Respondent counters that the remark cannot possibly have prejudiced
Petitioner, given the "avalanche of proof" of his guilt. (Resp't
Mem. at 58.)

Petitioner has not shown that he was prejudiced by his trial
counsel's failure to object to the prosecutor's statement.   A
prosecutor is given wide latitude in summation. See United States
v. Harry, 308 F. App'x 516, 517 (2d Cir. 2009) (citing United
States v. Casamento, 887 F.2d 1141, 1189 (2d. Cir. 1989)).   The
prosecutor "may not refer to facts that are not in the record or
misstate evidence," id. at 517 (citing United States v. Suarez, 588
F.2d 352, 354 (2d. Cir. 1978)), but it is permissible to "suggest
to the jury inferences that can be fairly drawn from the evidence."
Id. at 516 (citing Casamento, 887 F.2d at 1189).   Furthermore, a
mere showing of prosecutorial misconduct does not entitle a
petitioner to habeas relief.   See Bentley v. Scully, 41 F. 3d 818,

824 (2d Cir. 1994).  Rather, there must be a showing that the
petitioner "suffered actual prejudice because the prosecutor's
comments during summation had a substantial and injurious effect or
influence in determining the jury's verdict." Id.[7]  In determining
whether the petitioner suffered such prejudice, a court must
consider: "(1) the severity of the prosecutor's conduct; (2) what
steps, if any , the trial court may have taken to remedy any
prejudice; and (3) whether the conviction was certain absent the
prejudicial conduct." Id. (citing Gonzalez v. Sullivan, 934 F. 2d
419, 424 (2d Cir. 1991)).

The prosecutor did not go beyond acceptable limits in her
summation.  While it is true that the charge of sexually assaulting
Mrs. Sprung had been dismissed earlier in the case, the jurors had
nevertheless heard evidence that Petitioner had committed the
sexual assault, because that evidence was relevant to their
determination of whether he was responsible for her murder.  A
forensic biologist testified that Petitioner's semen had been found
inside the elderly woman's anus, and on the candles that had been
used to rape and sodomize her.  (See Tr. at 983, 989, 990-91.)  A
medical examiner testified that the bruising on Mrs. Sprung's body

---

[7] As the Supreme Court has noted, courts must consider
"whether the prosecutor's comments 'so infected the trial with
unfairness as to make the resulting conviction a denial of due
process.'" Darden v. Wainright, 477 U.S. 168, 181, 106 S. Ct.
2464, 2471 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S.
637, 643, 94 S. Ct. 1868, 1871 (1974)).

showed that those assaults must have taken place while she was still alive (see id. at 908-09), but that it was not clear whether she was conscious at the time (see id. at 909). Thus, the jury was already aware that Sara Sprung had been sexually violated with candles while she was still alive, that there was no way to know whether she had been conscious at the time, and that Petitioner's DNA had been found inside her body. The prosecutor did not misstate that evidence, or reference matters that had been excluded from the jury's consideration.

Moreover, given the large number of charges, the different levels of mens rea that variously applied to them, and the several theories of responsibility for murder, it was not unreasonable for the prosecutor to remind the jury that the People were not required to prove Petitioner's intent with regard to the sexual assault. Indeed, those statements may have had the effect of minimizing the jury's consideration of the sexual assault evidence, because the prosecutor made it clear that the sexual assault was of limited relevance to Petitioner's state of mind, the most significant issue for the jury's deliberations.

Therefore, there is no basis to conclude that Petitioner's attorney's failure to object to the statements when they were made was professionally unreasonable. More importantly, there is absolutely no basis to conclude that the failure to object to those comments had any impact on Petitioner's trial. In light of the

overwhelming evidence of Petitioner's guilt of the murders of three people quietly residing in their apartments, the few remarks about the sexual abuse that occurred could not have had any significant impact on the jury's verdict. Petitioner has therefore not met his burden of showing that he was prejudiced by his trial counsel's alleged errors. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

* * *

Because there was no substantial reason to object to the length of the charge, the verdict sheet, or the prosecutor's summation, and Petitioner cannot show prejudice as a result of his attorney's failure to object, Petitioner fails to establish his claims of ineffective assistance of counsel. Moreover, it should be noted that Petitioner's trial attorney represented him vigorously, in the face of insurmountable evidence. Petitioner had been caught fleeing the scene of the crime, carrying the murder weapon and valuables stolen from his victims, wearing clothes spattered with blood. (See Tr. 440-45, 556-66, 999.) Physical evidence from the scene, including DNA and fingerprints, linked him to the crimes. (See id. at 954-56, 962, 984, 993-94.) He confessed to the crimes several times, including in a videotaped statement to an assistant district attorney. (See id. at 666-68, 670.) Despite that overwhelming evidence, Petitioner's trial counsel managed to win a number of not-insignificant victories. He

succeeded in securing the dismissal of two counts of Aggravated Sexual Abuse. (<u>See</u> Pet. Mem. at 30 n.5; Resp't. Mem. at 47.)   He also convinced the court to instruct the jury on Petitioner's EED defense, despite the lack of any connection between the crimes committed and Petitioner's alleged emotional state. (<u>See</u> Tr. at 1039-42.) To support the EED defense, he presented testimony from Dr. Goldsmith about Petitioner's difficult childhood and recent traumatic breakup with Stephanie Rill. And, throughout the trial, he was a vigorous and skillful advocate, subjecting the prosecution's witnesses to careful cross-examination, raising objections to improper evidence and questions, and engaging in extensive discussions with the court regarding the proper wording of the jury charge on the EED defense.  In short, trial counsel was a vigorous advocate for Petitioner and cannot be faulted or held responsible for Petitioner's conviction.

Because Petitioner's counsel was not ineffective, it follows that the state court's determination that Petitioner was not denied effective assistance of counsel was not an unreasonable application of the <u>Strickland</u> standard.

### CONCLUSION

For the reasons stated above, this Court recommends that Petitioner's request for habeas relief be denied and the Petition be dismissed with prejudice.  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties

39

shall have fourteen (14) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6(a). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Barbara S. Jones, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Jones. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

Respectfully Submitted,

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: April 27, 2010
       New York, New York